STMICROELECTRONICS, Plaintiff,

v.

CREDIT SUISSE GROUP, Defendant.

No. 08 CV 3201(RJD)(RML).

United States District Court,
E.D. New York.

March 31, 2011.

Andrew Weissmann, Elisabeth Genn, Danielle F. Tarantolo, Jenner & Block, New York, NY, for Plaintiff.

Amanda Joan Gallagher, Linklaters, New York, NY, for Defendant.

## MEMORANDUM & ORDER

DEARIE, Chief Judge.

Plaintiff STMicroelectronics ("ST") seeks to hold defendant Credit Suisse Group ("CSG") liable under Securities Exchange Act Section 20(a) as a "controlling person" of non-party subsidiary Credit Suisse Securities ("CSS"), for the intentional breach of investment obligations by

the pair of Credit Suisse brokers in charge of ST's account. ST brings related claims for conversion, unjust enrichment and aiding and abetting common law fraud. Additionally, ST moves to amend its complaint to bolster allegations of wrongdoing by Credit Suisse entities and their employees, and to add a claim against CSG for primary liability under Exchange Act Section 10(b) and Rule 10b–5. ST further requests a modification of the discovery stay imposed by the Private Securities Litigation Reform Act ("PSLRA") to allow for the production of identified categories of documents.

Defendant CSG moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, and likewise argues that amendment would be futile. In the alternative, CSG asks the Court to dismiss the action in the absence of subsidiary CSS or to stay this action pending the appeal by CSS of an arbitration award confirmed in ST's favor on March 19, 2010, by the Honorable Deborah Batts of the Southern District of New York. The Court grants ST's motion to amend its complaint, allows ST's claims under Exchange Act Sections 10(b) and 20(a) to proceed, dismisses ST's state law claims with the exception of the conversion claim and denies as moot ST's request to modify the PSLRA stay.

## I. *Background.*

The following facts are contained in the plaintiff's Amended Complaint ("AC") and are assumed to be true. Given the prior criminal prosecution of the individual brokers involved, many of the facts regarding their activities are beyond dispute.

### A. *The parties.*

Plaintiff ST, a major producer of semiconductors, is a Netherlands corporation with headquarters in Switzerland. ST's shares are publicly traded on the New York Stock Exchange and other markets. Defendant CSG is a multi-national banking institution with offices around the globe, including the New York headquarters of wholly-owned subsidiary CSS. CSG is registered as a foreign issuer with the Securities and Exchange Commission ("SEC").

### B. *ST's investment agreement with CSS.*

In April 2006, two directors in Credit Suisse's Private Banking Division, Julian Tzolov and Eric Butler, approached ST with the specific offer of investing in auction-rate securities backed by federally guaranteed student loans ("SLARS"). On several occasions, Tzolov and Butler touted the SLARS as being virtually risk-free and highly liquid.[1] Based on these representations and given "ST's corporate treasury policies, which did not allow investments in structured or speculative securities," (AC ¶ 35), ST opened an account with CSS for the express purpose of investing exclusively in SLARS, with the limited exception of investing in overnight commercial paper to act as a bridge between auctions. ST made these restrictions clear to Tzolov and Butler, who confirmed their understanding. During their presentations to ST, moreover, Tzolov and Butler had not refer-

---

**1.** ST alleges that CSS marketing materials falsely represented that the SLARS derived their investment grade (Aaa/AAA) credit ratings from being "over-collateralized" and thus "100% guaranteed." (AC ¶ 14.) Further, because the SLARS could be sold or repurchased every 28 days at an interest rate (known as a "clearing rate") determined via auction, Tzolov and Butler described the investments as highly liquid. (*Id.* ¶¶ 34, 36.) Tzolov has since testified at Butler's criminal trial that the pair, during sales pitches, lied to prospective clients about the SLARS' return rates, credit ratings, maturity rates, investor profile and overall market value.

enced any other securities. In May 2006, ST wired an initial $200 million into the newly opened account. By August 2007, ST had funded the account with over $450 million.

### C. CSS breaches the investment agreement.

Although ST's funds were to be invested solely in SLARS, Tzolov, Butler and their assistants bought and sold other securities without ST's authorization and contrary to ST's investment criteria. These securities included, for example, auction-rate securities that were not investment grade and collateralized debt obligations ("CDOs") backed by subprime mortgages. The brokers, however, "repeatedly sent email messages to ST stating falsely that ST's portfolio consisted entirely of student loan securities." (*Id.* ¶ 38.) In trade confirmations sent via email, Butler and Tzolov changed the names of non-authorized securities—by deleting words such as "CDO" and adding words like "funding" or "student loan"—to lead ST to believe that these securities were SLARS.[2] Although Tzolov and Butler "confirmed to ST in writing" that additional investments would "be invested in the 28–day Aaa/AAA rated student loan issues," (*id.* ¶ 42), they did not provide ST with a private placement prospectus containing a description and risk profile of any "of the 28 different issues of non-student loan securities in which they invested ST's money between May 2006 and August 2007," (*id.* ¶ 44).

By November 2006, non-conforming securities comprised approximately 37% of ST's account holdings. By February 2007, the figure reached 100%, and CSS "did not

place a single conforming security in ST's account" from that point forward. (*Id.* ¶ 68.)

### D. ST discovers the fraud.

In July 2007, ST observed that $21 million of its funds had been invested in a security with a credit rating below the SLARS' normal Aaa/AAA rating. ST objected in writing, telling Tzolov and Butler to "stick to the mandate to buy only" SLARS. (*Id.* ¶ 45.) The brokers responded that the $21 million would be promptly reinvested in SLARS, but they failed to execute on that promise and made further unauthorized investments the "very next day." (*Id.* ¶ 46.)

In August 2007, when the market for auction-rate securities was liquid, ST instructed Tzolov and Butler to liquidate $200 million of the $476 million in ST's account and not to make new purchases for the account. The brokers ignored these instructions and made a non-authorized purchase the following day. ST again objected in writing, after which the managing director of Credit Suisse's Private Banking Division in New York "reassured ST that it had high-quality investments in its account and that ST had nothing to worry about."[3] (*Id.* ¶ 50.)

After demanding to no avail that CSS immediately liquidate any non-conforming holdings, in September 2007, ST reported the problem to CSG management in Switzerland, who admitted to ST that the "directors and brokers who handled ST's account violated ST's mandate to buy only" SLARS. (*Id.* ¶ 53.) Since that time, however, the market for auction-rate securities

---

**2.** For example, in three mid–2006 emails, South Coast Funding V, "a sub-prime CDO security that ST had not authorized," was described as "South Coast Funding *St. Loan.*" (AC ¶ 41.)

**3.** The same executive also allegedly told clients that their accounts failed due to "market forces," created false documentation to show that clients had authorized the trades and gave a "pretextual reason" for the change in ST's account management. (AC ¶¶ 51, 79.)

has collapsed and ST has been unable to withdraw any funds from its account.[4] These events allegedly have forced ST to arrange costly alternative financing while recording impairments of over $300 million due to the illiquidity and degraded ratings of the securities within its account.

### E. *CSG's alleged role in the fraud.*

In the Amended Complaint, ST alleges that parent company CSG either knew about or ignored warning signals of the fraud perpetrated by CSS. ST alleges, in somewhat hazy fashion, that a supervisor reviewed doctored emails sent by Tzolov and Butler and that the same (or another) supervisor repeatedly caught Tzolov and Butler using unapproved marketing materials. In late 2006, CSG recognized that subprime CDOs and auction-rate securities, the types of securities being placed in ST's account, could be unsafe investments. To quote CEO Bradley Dugan, " 'all along [CSG] had a clear view that this was a market that was going to have difficulty,' " a concern allegedly expressed by high-level CSG executives as early as 2005. (*Id.* ¶¶ 67, 76.) Due to this concern, Credit Suisse allegedly "had an intentional strategy of reducing its exposure" to these holdings, which resulted in the press lauding CSG for weathering the credit crisis better than its competitors. (*Id.* ¶ 67.) During this same period, CSS "was selling risky and unsuitable [auction-rate securities] through its Corporate Cash Management Group, whose customers typically require extremely low-risk, highly liquid investments that can be treated as cash equivalents." (*Id.* ¶ 70.) In 2008, moreover, after writing down $2.65 billion due to unrelated misconduct by brokers in-

volved with CDOs and asset-backed securities, CSG publicly conceded the ineffectiveness of its internal controls.

In 2007, details regarding CSG's knowledge of the fraud began to emerge. In October 2007, *The Wall Street Journal* published a story in which an attorney for Butler and Tzolov admitted that at least one customer had received a "misleading email." (*Id.* ¶ 60.) Credit Suisse publicly minimized the scope of the alleged misconduct as relating to a " 'limited number of clients' " with whom Credit Suisse was in " 'active discussions.' " (*Id.*) A month earlier, however, after ST informed CSG management about the unauthorized trading, CSG's general counsel had allegedly "falsely stated that ST was the only victim." (*Id.* ¶ 53.) In July 2008, The *Wall Street Journal* published another story in which Credit Suisse admitted that it had " 'detected prohibited activity' " by Butler and Tzolov nearly a year earlier and " 'immediately suspended' " them for " 'violat[ing] their obligations' " to Credit Suisse and to clients. (*Id.* ¶ 82.)

Additionally, ST alleges that parent company CSG had a motive to ignore signals that Credit Suisse brokers may have been defrauding customers like ST. Credit Suisse allegedly "benefited from the substantially higher fees" earned on the nonconforming securities by capturing the excess return for itself while shifting the increased risk to consumers. (*Id.* ¶¶ 63, 70.) For some of these issues, Credit Suisse entities earned additional fees as collateral manager or for making the initial placement on the underwriter's behalf. CSG also allegedly created the incentive structure which led Butler and Tzolov to elevate short-term profits over clients' long-term goals.[5]

---

**4.** ST alleges that "while the ARS market did not 'freeze' until February 2008, the auctions for every single security in ST's account failed six months earlier." (AC ¶ 69.)

**5.** In accordance with "widespread" practice, Butler and Tzolov allegedly often purchased auction-rate securities on the secondary market at less than par value, then sold them to customers at market prices and kept the excess part of the purchase price. (AC ¶ 74.)

Finally, ST alleges that CSG, through its officers, exercised authority over Butler and Tzolov and conducted negotiations arising from the brokers' misconduct. For instance, in late 2007, the CEO of CSG's Private Banking Division traveled to New York to discuss the brokers and the accounts they managed. At around that time, CSG met with ST in Europe on multiple occasions regarding how to deal with ST's account. After negotiating with state regulators, CSG allegedly authorized the repurchase by Credit Suisse of securities held by individual and institutional investors, but not ST. And it allegedly was CSG, rather than CSS, that years earlier had announced Butler and Tzolov's promotions.

### F. The arbitration, criminal and SEC proceedings.

In February 2008, ST commenced an arbitration against CSS with the Financial Industry Regulatory Authority ("FINRA"). In the FINRA arbitration, ST asserted claims under Exchange Act Section 10(b) and Rule 1 0b–5, as well as for common law fraud, misrepresentation, fraudulent concealment, breach of contract, breach of fiduciary duty, unjust enrichment, unsuitability, unauthorized transactions and failure to supervise. *See* Award, FINRA Dispute Resolution, Case No. 08–00512, http://finraawardsonline. finra.org/turing.aspx?doc=41723. While the arbitration was pending, ST filed its initial complaint with this Court in August 2008.

In February 2009, on the strength of "a record replete with evidence of Credit Suisse's fraud, and devoid of any impropriety on behalf of the arbitrators," the FINRA panel unanimously awarded ST over $406 million plus post-award interest exceeding $50,000 per day. (3/19/10 Order, 09 CV 1388(DAB), Dkt. # 21, at 8.) The award, in the nature of rescission, requires CSS "immediately" to pay ST in exchange

for ST's transferring ownership of the securities in its account back to CSS. (*Id.* at 4.) In March 2010, Judge Batts of the Southern District of New York confirmed the award. In later rejecting CSS's motion to alter the judgment, Judge Batts expressed that CSS had exhibited "remarkable gall" by requesting credit for funds ST had received from a third party, "particularly where Credit Suisse has yet to satisfy even a sou of the hundreds of millions it owes ST *under the Award*." (8/25/10 Order, 09 CV 1388(DAB), Dkt. # 31, at 5.) After posting a sizeable bond, CSS filed a timely notice of appeal. The Second Circuit heard oral argument in the case on March 28, 2011; a decision is pending.

In August 2009, after a trial before the Honorable Jack B. Weinstein, a jury convicted Butler of three counts of securities fraud. Judge Weinstein sentenced Butler to concurrent five-year prison terms and imposed a $6 million fine. *See United States v. Butler*, 264 F.R.D. 37 (E.D.N.Y. 2010). According to Judge Weinstein, Butler's "trial laid bare the pernicious and pervasive culture of corruption in the financial services industry." *Id.* at 37. Judge Weinstein concluded that Butler "disregarded his responsibility to the financial well-being of his clients for the sake of his own short-term financial gain, in the form of commissions he earned on fraudulent sales." *Id.* at 39–40. While faulting inattentive purchasers, among others, Judge Weinstein specifically noted "a failure by Credit Suisse, Butler's employer, . . . to adequately supervise [its] own brokers and traders." *Id.* at 40.

Tzolov, who fled prosecution and was apprehended in Spain, pleaded guilty and testified at Butler's trial. Tzolov's sentencing is scheduled for April of this year.

In September 2008, moreover, the SEC commenced a successful civil enforcement

action against both defendants, who are now permanently enjoined from violating Exchange Act Sections 10(b) and 17(a). *See SEC v. Tzolov,* 08 CV 7699 (S.D.N.Y.). In June 2010, Tzolov consented to judgment without admitting liability. In January 2011, the court granted the SEC's motion for summary judgment against Butler, who has since appealed to the Second Circuit.

## II. *Claims against CSG.*

The Court assesses the merit of ST's proposed Amended Complaint by the familiar Rule 12(b)(6) standard. *See Lucente v. IBM Corp.,* 310 F.3d 243, 258 (2d Cir.2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss...."). The Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). "For purposes of this rule, 'the complaint is deemed to include any written instrument attached to it as an exhibit, or any statements or documents incorporated in it by reference.' " [6] *Id.* at 152 (quoting *Int'l Audiotext Network, Inc. v. AT & T Co.,* 62 F.3d 69, 72 (2d Cir.1995)).

### A. *ST has sufficiently pled a Section 20(a) claim.*

■■■ As the parties acknowledge, ST's successful arbitration against CSS does not bar a claim for controlling person liability against CSG. *See Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998). Exchange Act Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable" for a primary Section 10(b) violation "shall also be liable

jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). "In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky,* 159 F.3d at 720 (quoting *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996)). Controlling person liability "is a separate inquiry from that of primary liability and provides an alternative basis of culpability." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 101 (2d Cir.2001).

### i. Primary violation.

■■■ Given the FINRA award and earlier criminal proceedings, CSG no longer disputes that ST has adequately alleged a primary Section 10(b) violation by CSS. Nor could it; any argument by CSG denying the existence of a well pleaded underlying violation would be quickly rejected. As discussed below, liability hinges on a "determination of [CSG]'s control of the primary violator as well as [CSG]'s particular culpability." *Boguslavsky,* 159 F.3d at 720. As the Second Circuit has dictated, however, "possible recovery under § 20(a) cannot exceed the damages assessed by the arbitrators against the primary violators." *Id.* at 721.

### ii. Control over primary violator.

■■■ ST has properly alleged CSG's control over CSS and, by extension, Butler and Tzolov. To allege control, as with any other element, a "plaintiff[ ] must plead only sufficient factual matter, accepted as

---

6. In this case, such documents include, for example, the brokers' fraudulent emails and the written FINRA Resolution.

true, to state a claim to relief that is plausible on its face." *Cornwell v. Credit Suisse Grp.*, 689 F.Supp.2d 629, 639 (S.D.N.Y.2010) (internal quotation marks omitted). "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *First Jersey*, 101 F.3d at 1472–73 (quoting 17 C.F.R. § 240.12b–2). "For purposes of Section 20(a) liability, 'actual control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof.'" *Dietrich v. Bauer*, 126 F.Supp.2d 759, 765 (S.D.N.Y.2001) (quoting *Sanders v. Gardner*, 7 F.Supp.2d 151, 163 (E.D.N.Y.1998)). "In cases involving parent-subsidiary relationships, courts have regularly based findings of control person liability on allegations of substantial stock ownership and common principals." *Kalin v. Xanboo, Inc.*, 526 F.Supp.2d 392, 406 (S.D.N.Y.2007).

CSG did not dispute the control element in its initial opposition brief. In opposing ST's motion to amend, CSG argues in conclusory fashion that it cannot control employees of CSS because the latter cannot delegate control over its individual brokers. In support of this argument, CSG cites to a single district court case, *AXA Distributors, LLC v. Bullard*, 2008 WL 5411940 (M.D.Ala.2008), holding that an annuity distributor was not "associated" under FINRA regulations with the individual employees of an unrelated retail agent with whom the distributor contracted. This case does not undermine CSG's alleged control over subsidiary CSS within the meaning of Section 20(a).

Here, ST "has sufficiently pled a mix of substantial stock ownership, shared officers and principals, and at least some direct involvement" by CSG in the underlying events to survive a motion to dismiss. *Kalin*, 526 F.Supp.2d at 406. ST asserts that CSS is a wholly-owned subsidiary of CSG and that the entities' executives overlap significantly at the highest levels. Indeed, ST spends a considerable portion of its motion papers arguing that CSG and CSS operate internally and market themselves externally as a single entity, to the point where the managing director of Credit Suisse's Private Banking Division, who supervised Butler and Tzolov, allegedly testified during the arbitration that he was unsure for which entity he ultimately worked. (*See* AC ¶ 57.) When Butler and Tzolov were promoted, ST asserts that it was CSG, rather than CSS, that announced the promotions. Perhaps most importantly, ST alleges that CSG "retained ultimate authority to decide how to respond to the complaints of ST and other" clients regarding the fraud and in fact negotiated settlements with public entities. (*Id.* ¶¶ 58–59.) These allegations pass the threshold required to indicate control.

### iii. Culpable participation.

The text of Section 20(a) provides an exception from liability where "the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation." 15 U.S.C. § 78t(a). From this language arise the dual notions of culpability and participation in the underlying fraud. The parties diverge, however, over whether "culpable participation" is an element which a plaintiff must plead to state a claim for controlling person liability.

As this Court previously has noted, the Second Circuit has yet to decide the issue. *See In re CINAR Corp. Sec. Litig.*, 186 F.Supp.2d 279, 309 (E.D.N.Y.2002). Since then, other district courts have exhaustively catalogued the relevant authority and concluded that, whoever bears the burden of proving or negating "culpable partic-

ipation," the statute mandates no such allegations at the pleading stage. *See, e.g., In re Parmalat Sec. Litig.*, 375 F.Supp.2d 278, 309 (S.D.N.Y.2005) ("[P]laintiffs state a legally sufficient claim under this statute if they plead (1) a primary violation by a controlled person and (2) control of the primary violator by the defendant."); *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392, 415 (S.D.N.Y.2003) ("[I]t appears that a plaintiff must plead only the existence of a primary violation by a controlled person and the direct or indirect control of the primary violator by the defendant in order to state a claim under Section 20(a).").

The Court agrees with this approach, which the Second Circuit has endorsed in the broker/dealer context. In cases in which a salesperson completes unauthorized "transactions through the employing brokerage house and the brokerage house receives a commission on the transactions, the burden of proving good faith is shifted to the brokerage house." *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir.1980). To avoid liability, the employer must "show at least that it has not been negligent in supervision and that it has maintained and enforced a reasonable and proper system of supervision and internal control over sales personnel." *Id.* ST having sufficient pled a primary Section 10(b) violation and CSG's control over CSS, the burden shifts to CSG to prove the adequacy of its internal controls.

 CSG argues that *Kohn* is irrelevant because ST's Section 20(a) claim is aimed not at the brokers' direct employer, but rather the employer's parent company. The fact that CSG may be a corporate level removed from Butler and Tzolov, however, does not necessarily alter the result. *See id.* at 714 ("[T]he controlling person provisions were intended to expand ... the scope of liability under the securities laws."). ST alleges that CSG incorporates CSS's financial results directly into

its own, meaning that any commissions earned by CSS on fraudulent transactions inure ultimately to CSG's benefit. This burden-shifting rule, moreover, has an outer limit, and will not apply where the relationship between an organizational defendant and the individual brokers is so attenuated as to break the chain of control required by Section 20(a). *See Moss v. Morgan Stanley Inc.*, 553 F.Supp. 1347, 1350 (S.D.N.Y.1983) (refusing to apply *Kohn* standard where employee who leaked inside information was "operating outside of the scope of his employment," thus providing "no relationship between the parties to give Morgan Stanley control ... with respect to the acts in question").

 Even were ST required to plead CSG's culpable participation in the underlying fraud, ST has adequately done so. Opinions following *Kohn* have held that "the failure to supervise satisfies the culpable participation element to establish liability under Section 20(a)." *CompuDyne Corp. v. Shane*, 453 F.Supp.2d 807, 830 (S.D.N.Y.2006); *see also First Jersey*, 101 F.3d at 1473 ("To meet the burden of establishing good faith, the controlling person must prove that he exercised due care in his supervision of the violator's activities...."); *Ruiz v. Charles Schwab & Co., Inc.*, 736 F.Supp. 461, 464 (S.D.N.Y.1990) ("[T]he failure of the controlling person to diligently enforce a proper system of internal supervision may be sufficient for liability.").

Contrary to CSG's contention, ST's allegations of deficient oversight are not repackaged control allegations. Rather, ST alleges "particularized facts of the controlling person's conscious misbehavior or recklessness." *Lapin v. Goldman Sachs Grp., Inc.*, 506 F.Supp.2d 221, 246 (S.D.N.Y.2006). ST paints a picture showing a reckless failure to supervise. CSG allegedly created the incentive structure

that motivated brokers like Butler and Tzolov to inflate their own short-term profits at their clients' long-term expense, which allowed Credit Suisse entities and brokers to rake in substantial commissions on the unauthorized sales of risky auction-rate securities and CDOs to unsuitable customers, with some transactions bringing additional fees to Credit Suisse as collateral manager or placement agent. All the while, according to the Amended Complaint, CSG limited its own exposure to these same securities and privately questioned their value. ST alleges that, upon learning of the fraud in the middle of 2007, CSG delayed notifying clients or regulatory authorities to continue collecting fees in the auction-rate securities market, to obscure the true extent of losses and to maintain its reputation for relatively sound risk management. Had the supervisors who allegedly caught Butler and Tzolov using unauthorized promotional materials bothered to verify the numbers within, they would have discovered, as Tzolov has since testified, blatant fabrications.

Indeed, the epithets CSG lobs at ST for failing to monitor its own investments—*i.e.*, "shocking," "cavalier" and "irresponsible" (Opp. at 4)—more aptly describe CSG's alleged failure to prevent or detect the flagrant, calculated and sustained misconduct of brokers within a major global office. In early 2008, after writing down billions of dollars due to a separate intentional fraud by Credit Suisse brokers, CSG publicly stated that its internal controls " 'were not effective,' " and at least one major ratings agency agreed. (AC ¶ 77.) These allegations, taken together, raise the plausible inference that CSG did not "act[ ]in good faith" and that it "directly or indirectly induce[d] the act or acts constituting the [primary] violation." 15 U.S.C. § 78t(a). Thus, irrespective of whether culpable participation is required at the pleading stage, ST is "entitled to offer evidence to support" its control person claim. *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995).

### B. *ST has sufficiently pled a Section 10(b) claim.*

In the Amended Complaint, ST asserts that CSG committed the fraud and, therefore, is primarily liable under Section 10(b) and Rule 10b–5. Citing to the Second Circuit's holding in *Boguslavsky,* CSG responds that because the FINRA panel has already determined the amount of damages caused by Butler and Tzolov's primary violations, ST is collaterally estopped from asserting a Section 10(b) claim against CSG. Such a reading of *Boguslavsky* is misguided.

The plaintiff in *Boguslavsky* commenced an arbitration proceeding with FINRA's predecessor, the National Association of Securities Dealers ("NASD"), alleging violations of Section 10(b) and Rule 10b–5 for material omissions in connection with the purchase of securities from a broker/dealer's inventory. Among the named defendants were a law firm and lawyer who acted as voting trustee for all of the broker/dealer's outstanding shares. The law firm "refused to submit to the NASD panel's jurisdiction, so it was not a party to the arbitration." *Id.* at 718. The plaintiff then filed Section 10(b) claims, along with claims for "control person" liability under Exchange Act Section 20(a), against the lawyer and law firm in the Southern District of New York. After the NASD panel issued an award in the plaintiff's favor, the District Court dismissed the subsequently filed lawsuit.

The Second Circuit agreed that to the extent the plaintiff "sought to relitigate the issue of damages for violations of Rule[ ] 10b–5," collateral estoppel barred the plaintiff's claim. *Id.* at 720. The plaintiff's "claim that the defendants were liable as controlling persons under § 20(a) was

not collaterally estopped," however, as that claim involved issues which "could not have been resolved in the NASD proceeding." *Id.* at 721. Congruent with its holding regarding the Section 10(b) claim, the Second Circuit concluded that recovery under Section 20(a) could not "exceed the damages assessed by the arbitrators" and limited the plaintiff's "recovery to the unrecovered portion of the arbitration award." *Id.* at 721.

■■■ As the parties recognize, *Boguslavsky* controls. Under these circumstances, the fact that CSG refused to submit to the FINRA panel's jurisdiction does not "prevent[ ] it from invoking collateral estoppel." *Id.* at 719 n. 3. Because CSG would not submit to arbitration, however, its own liability under Section 10(b) "could not have been resolved in the [FINRA] proceeding." *Id.* at 721; *see also Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 223, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) ("[C]ourts may directly and effectively protect federal interests by determining the preclusive effect to be given to an arbitration proceeding."). It is well established that "[w]hen a litigant files consecutive lawsuits against separate parties for the same injury, the entry of a judgment in the prior action does not bar the claims against other potentially liable parties." *Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 367 (2d Cir.1995).

■■■ Thus, the Court will allow ST's claim under Section 10(b) to proceed on an actual agency theory.[7] The same allegations which support the element of control under Section 20(a), as described above, raise the plausible inference that CSS may have acted as CSG's agent in dealing with ST. Indeed, "[t]he element of control often is deemed the essential characteristic of the principal-agent relationship." *In re Parmalat Sec. Litig.,* 594 F.Supp.2d 444, 451 (S.D.N.Y.2009) (holding that a genuine issue of material fact existed regarding whether a global company could be held liable for a fraudulent audit conducted by a member firm and putative agent). At this stage, therefore, ST is entitled to press claims under Sections 10(b) and 20(a) in the alternative. *See Kohn,* 629 F.2d at 717 ("[T]here is no warrant for believing that Section 20(a) was intended to narrow the remedies of the customers of brokerage houses or to create a novel defense in cases otherwise governed by traditional agency principles.").

■■■ CSG correctly asserts that "[t]he presence of a parent's logo on documents created and distributed by a subsidiary, standing alone, does not confer authority upon the subsidiary to act as an agent." *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1461–62 (2d Cir.1995) (awarding summary judgment to the defendant). But ST has alleged more than simply that Credit Suisse entities share the same brand logo and email suffix. According to the Amended Complaint, CSG publicly has described the New York headquarters of CSS as a "local office" within an "integrated bank." (AC ¶ 57.) Further, ST alleges with particularity that CSG, in devising the incentive and compliance structures in place at CSS and deciding how to respond to customer complaints in the wake of Butler and Tzolov's misconduct, played "a substantial role in the legal and risk management affairs" of CSS. *In re Parmalat,*

---

7. Despite CSG's assertion to the contrary, the Supreme Court's reaffirmance in *Stoneridge Investment Partners v. Scientific–Atlanta,* 552 U.S. 148, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008), that no private cause of action for aiding and abetting exists under the federal securities laws does not abrogate, or even speak to, the application of "agency principles to hold brokerage firms liable for the acts of their employees." *SEC v. Mgmt. Dynamics, Inc.,* 515 F.2d 801, 813 (2d Cir.1975).

594 F.Supp.2d at 453. Although ST's agency theory may prove unfounded, "questions as to the existence and scope of the agency are issues of fact and are not properly the basis of a motion to dismiss." *Heredia v. United States,* 887 F.Supp. 77, 80 (S.D.N.Y.1995) (internal quotation marks omitted). The bones are enough for now; discovery may provide the meat.

"Importantly, whether such an agency exists depends upon the actual interactions of the putative agent and principal and not on the perception a third party may have of the relationship." *Manchester Equip. Co., Inc. v. Am. Way,* 60 F.Supp.2d 3, 8 (E.D.N.Y.1999). By comparison, " 'apparent authority is dependent upon verbal or other acts by a principal which reasonably give an appearance of authority to conduct the transaction.' " *Atex,* 68 F.3d at 1462 (quoting *Greene v. Hellman,* 51 N.Y.2d 197, 204, 433 N.Y.S.2d 75, 412 N.E.2d 1301 (1980)). Notwithstanding the scope or extent of CSS's actual authority, ST has not sufficiently alleged that CSG conferred apparent authority on CSS to bind CSG, contractually or otherwise, to ST. The allegations in each of ST's complaints show that during the period in which Butler and Tzolov made the unauthorized purchases, ST believed that it was dealing with CSS. Only when CSS refused to liquidate ST's non-conforming account holdings did ST allegedly appeal to CSG management in Switzerland. (*See* AC ¶ 53.) Further, ST bases its Section 10(b) claim on "substantial evidence that has emerged" since ST filed its initial complaint against CSG in August 2008. (Mem. in Support of Mot. to Amend, Dkt. # 50, at 6.) Discovered well after the unauthorized purchases took place, this information could not have influenced ST's "perception of the [CSG–CSS] relationship" during the period at issue. *Manchester Equip.,* 60 F.Supp.2d at 9.

Likewise, ST may not prosecute its Section 10(b) claim utilizing a respondeat superior theory that would impute liability for Butler and Tzolov's acts directly to CSG. *See Suez Equity,* 250 F.3d at 100–01. Where the evidence supports a finding that an agent made misrepresentations simultaneously on behalf of distinct entities, there is "no difference in the fact of liability of the two as principals." *Slotkin v. Citizens Cas. Co. of New York,* 614 F.2d 301, 316–17 (2d Cir.1979) (holding that reinsurer could be held equally liable for misstatements made by insurer's agent during settlement negotiations, where reinsurer consented to settlement with no other employee present). Here, however, ST has provided irreconcilable allegations regarding Butler and Tzolov's employment status. Although ST's initial complaint refers repeatedly to CSS as the party responsible for the fraud, the Amended Complaint asserts that CSG "has admitted publicly," albeit ambiguously, that the brokers' Private Banking Division is in fact located within CSG. (AC ¶ 57.) Having previously secured an arbitration award against CSS under a respondeat superior theory, ST cannot now take the contrary position that separate entity CSG is directly and vicariously liable for Butler and Tzolov's primary securities violations.[8] *See DeRosa v. Nat'l Envelope Corp.,* 595 F.3d 99, 103 (2d Cir.2010).

Nor has ST plausibly alleged that CSG is CSS's alter ego, which "cannot be inferred from the close relationship and overlap in executives." *In re Parmalat,* 375 F.Supp.2d at 296–97 (requiring "an intermingling of funds or a failure to ad-

---

8. Of course, that ST no longer can argue that Butler and Tzolov individually were agents of CSG does not exclude the possibility that CSS acted as CSG's agent in transactions with customers, including ST, in which Butler and Tzolov participated.

here to corporate formalities"). Although ST alleges a potentially reckless failure of oversight by CSG, the Amended Complaint presents no "specific facts or circumstances" to support the conclusion that "the fraudulent actions taken by [CSS] employees" resulted from CSG's domination. *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir.1996). "To hold otherwise would create an alter ego relationship between almost every parent and subsidiary." *In re Parmalat*, 375 F.Supp.2d at 297. ST's factual allegations in this regard, however, which the Court accepts as true for purposes of this motion, bolster the independent claim of a principal-agent relationship between CSG and CSS.

The legal theory, if any, upon which ST might hold CSG liable may ultimately prove irrelevant. Despite ST's argument that the amount of the arbitration award does not represent the full extent of its damages, "[t]he issue of compensatory damages," whether under Section 10(b) or 20(a), "is totally precluded from relitigation in the District Court." *Boguslavsky*, 159 F.3d at 721.

## C. *State law claims.*

In addition to federal securities claims, ST brings claims against CSG for unjust enrichment, aiding and abetting common law fraud and conversion. Of these, only the conversion claim survives.

### i. Unjust enrichment.

 Collateral estoppel bars ST's claim for unjust enrichment. When a party secures an arbitration award for "violation of federal securities laws," any "claims under state law [a]re barred under the doctrine of collateral estoppel [if] they were actually and necessarily decided in the arbitration." *Ganguly v. Charles Schwab & Co., Inc.*, 142 Fed.Appx. 498, 499 (2d Cir.2005). ST basis its unjust enrichment claim against CSG on the undifferentiated allegation that "Credit Suisse obtained sales credits and other fees on purchases" of unauthorized securities for ST's account. (AC ¶ 105.) This issue was "litigated in the arbitral forum," and the determination of whether Credit Suisse profited from the fraud "was necessary to the result reached by the arbitrators." *Boguslavsky*, 159 F.3d at 720. No additional evidence of action or culpable inactivity would be required to hold CSG liability under this theory, for which ST seeks the same recessionary damages pursued via the Section 10(b) and 20(a) claims. Thus, ST may not relitigate its unjust enrichment claim in this forum.[9]

### ii. Aiding and abetting common law fraud.

 Collateral estoppel does not bar assertion of claims that were not presented during the FINRA arbitration. *Boguslavsky*, 159 F.3d at 722. This includes the claim that CSG aided and abetted common law fraud. "To establish liability for aiding and abetting fraud, the plaintiffs must show (1) the existence of a fraud; (2)[the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006). On account of this claim, ST seeks

---

**9.** Even in the absence of collateral estoppel, ST's contract with CSS, the validity of which is undisputed, bars the unjust enrichment claim. As here, "where an express and valid contract exists concerning the rights at issue, quasi-contract claims such as unjust enrichment are precluded" even when asserted against non-signatories to the contract. *SCM Grp., Inc. v. McKinsey & Co., Inc.*, 2011 WL 1197523, at *7–8 (S.D.N.Y.2011); *see also Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir.2006).

damages for the period beginning in August 2007.

 The pertinent question, which the parties dispute vigorously, is whether ST adequately alleges that CSG substantially assisted the underlying fraud. " 'Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.' " *Lerner,* 459 F.3d at 295 (quoting *Kaufman v. Cohen,* 307 A.D.2d 113, 126, 760 N.Y.S.2d 157 (1st Dep't 2003)). "In the aiding and abetting context, a plaintiff must allege that the defendant's substantial assistance in the primary violation proximately caused the harm on which the primary liability is predicated." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,* 479 F.Supp.2d 349, 371 (S.D.N.Y. 2007).

ST argues that CSG substantially assisted and therefore caused the fraud by CSS, Butler and Tzolov by failing to disclose the extent of the fraud in statements to the press and regulators and by refusing to return ST's funds. None of these actions could have aided and abetted the underlying fraud against ST, which, by the time CSG allegedly learned of it, "already ha[d] been committed." *United States v. Shulman,* 624 F.2d 384, 387 (2d Cir.1980). ST has not plausibly alleged that the fraud was "continuous" or "ongoing" by the time CSG became involved in September 2007. *Dreieck Finanz AG v. Sun,* 1990 WL 11537, at *5 (S.D.N.Y.1990). Nor do the Amended Complaint's allegations support the inference that, while unauthorized purchases still were being made, CSG "participated in the venture as something it wished to bring about and sought by its action to make the venture succeed." *Armstrong v. McAlpin,* 699 F.2d 79, 92 (2d Cir.1983); *see also Lerner,* 459 F.3d at 294 (holding " 'red flags' " incapable of "establish[ing] a claim for aiding and abetting

fraud" where they "do not create a strong inference of actual knowledge of [a broker's] out-right theft of client funds").

 Although banks have a duty to safeguard "funds deposited with them when confronted with clear evidence indicating that those funds are being mishandled," *Lerner,* 459 F.3d at 295, ST alleges that by the time it informed CSG of the fraud, the market for its securities already was frozen. (*See* AC ¶ 69.) It is unclear what new information CSG could have disclosed that would have allowed ST to protect its interests after this time—and ST specifically alleges none—given that ST's aiding and abetting claim is based on the inability or outright refusal of Credit Suisse to return ST's funds. ST does not allege any subsequent unauthorized purchases, moreover, which are the precise "harm on which the primary liability is predicated." *Fraternity Fund,* 479 F.Supp.2d at 371. In short, the prior purchases would have been as likely to occur had ST never informed CSG of the fraud at all.

### iii. Conversion.

 To the extent that ST seeks to hold CSG accountable under New York law for wrongfully retaining the funds in ST's account, the proper cause of action is conversion. Under New York law, "to establish a claim for conversion, a plaintiff must show that: '(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.' " *AD Rendon Commc'ns, Inc. v. Lumina Ams., Inc.,* 2007 WL 2962591, at *5 (S.D.N.Y.2007) (quoting *Moses v. Martin,* 360 F.Supp.2d 533, 541 (S.D.N.Y.

2004)). Further, "when the original possession of the property is lawful, a plaintiff must make a demand for the allegedly converted property and the possessor must refuse." *Id.*

 CSG argues that ST's conversion claim should be dismissed as "duplicative of [its] breach of contract claim" decided in the FINRA proceeding. *Id.* at *4. The Amended Complaint, however, sets forth acts by CSG that could be viewed as "unlawful or wrongful as opposed to mere violations of contractual rights." *Fabry's S.R.L. v. IFT Int'l, Inc.,* 2003 WL 21203405, at *7 (S.D.N.Y.2003). Specifically, ST asserts that CSG, after learning of prohibited activity by Butler and Tzolov in the summer of 2007, misrepresented the scope of the fraud to clients and to the public and refused to return ST's funds. ST also alleges that CSG's general counsel and Chief Operating Officer "vowed that, if ST brought [a] legal action to recover its funds, [CSG] would blame ST." (AC ¶ 5.) Hence, the Amended Complaint permits the finding that CSG's "retention of the payments collected from [ST] without authorization and in defiance of [ST]'s superior right of ownership is sufficient to establish conversion as an action distinct from any breach of contract claim." *Fabry's S.R.L.,* 2003 WL 21203405, at *7; *see also Pilliard v. Sotheby's, Inc.,* 1997 WL 381795, at *4 (S.D.N.Y.1997) (allowing a consignor to bring a conversion claim that was "arguably based upon improper conduct by" a negligent consignee, including misrepresentations made after the fact "in an attempt to minimize damages").

 On the merits, CSG disputes both that it controlled ST's account and that its alleged passivity in the face of ST's demand could have comprised an exercise of authority over the account. ST asserts the opposite, and further alleges that CSG, rather than CSS, negotiated with account holders regarding the unauthorized pur-

chases after the fraud came to light. Whether proof will support these allegations remains for another day, as does the issue of whether ST may be entitled to the punitive damages it seeks. (*See* AC ¶ 103.) Although the FINRA panel denied ST's request for punitive damages against CSS, "the imposition of such damages requires an individualized examination of, among other factors, the conduct and state of mind of each defendant." *Boguslavsky,* 159 F.3d at 721 ("Since the defendants in this case were not parties to the NASD proceeding, there no inquiry into their specific liability for punitive damages in the arbitral forum.").

### III. *CSG's request for Rule 12(b)(7) dismissal or a stay.*

CSG requests dismissal under Rule 12(b)(7) for ST's failure to join CSS as an indispensable party. In the alternative, CSG requests that this Court stay the action pending the resolution of CSS's appeal of the FINRA award's confirmation. Both arguments lack merit.

#### A. *Rule 12(b)(7).*

 CSG offers an array of arguments why this case cannot proceed due to ST's "failure to join [CSS] under Rule 19." Fed.R.Civ.P. 12(b)(7). CSG has failed to show, however, that CSS is either a necessary or an indispensable party to this litigation.

 "When deciding a Rule 12(b)(7) motion, a court must initially determine if the absent person should be joined as a party." *Ashley v. Am. Airlines, Inc.,* 738 F.Supp. 783, 788 (S.D.N.Y.1990). "The burden is on the moving party to show the nature of the material interests of the absent person in the subject matter of the suit." *Id.* Despite CSG's assertions, the Court cannot conceive of any interest of CSS that may "as a practical matter [be]

impair[ed] or impede[d]" should this lawsuit proceed in its absence. Fed.R.Civ.P. 19(a)(1)(B)(i). The actions of CSG and its officers during the relevant time period are the focus of this litigation. The arbitration proceedings involving CSS are complete, and the amount of compensatory damages under Section 10(b) has been fully litigated.[10] Thus, there is little danger of CSS being bound by findings made in its absence, and CSS need not worry about "the effect of the doctrines of issue and claim preclusion on a parallel, subsequently-filed" action. *Vedder Price Kaufman & Kammholz v. First Dynasty Mines,* 2001 WL 1190996, at *3 (S.D.N.Y.2001).

■ For the same reasons, CSS's absence will not subject CSG to "multiple" or "inconsistent obligations," Fed.R.Civ.P. 19(a)(1)(B)(ii), or mean that "the court cannot accord complete relief among existing parties," *id.* 19(a)(1)(A). Either CSG is liable as a controlling person or a corporate principal under the federal securities laws, or it is not; and either CSG is liable for conversion under state law, or it is not. Any of these results is consistent with the previous finding of primary liability as against CSS. The Court also notes that CSS's multi-billion dollar parent company, represented here by the same lawyers who represented CSS in the FINRA arbitration, will more than adequately represent any interest of CSS in this litigation.

■ Even if CSS were considered a necessary party, "Rule 19(b) does not authorize dismissal simply because such a party cannot be joined." *Jota v. Texaco, Inc.,* 157 F.3d 153, 162 (2d Cir.1998). Rather, "the Court is to determine 'whether in equity and good conscience the action should proceed among the parties before it.' " *Id.* (quoting Fed.R.Civ.P. 19(b)). For the reasons discussed above, CSS will suf-

fer little or no hardship from this action beyond that which it would suffer if joined as a party. More importantly, CSG "present[s] no evidence that [ST] could bring 'the same action, against the same parties ... in a[nother] court.' " *Prescription Plan Serv. Corp. v. Franco,* 552 F.2d 493, 497 (2d Cir.1977) (quoting *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 112, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968)). By agreement, ST was required to arbitrate any claims against CSS. CSG refused to submit to the FINRA panel's jurisdiction, prompting the very piecemeal litigation that CSG now invokes as a ground for dismissal. Dismissing an action on this basis would immunize corporate parents from secondary liability for the actions of subsidiary FINRA members. Thus, this Court agrees "that there is no requirement in the language of [the] statute that the controlled person be named as a defendant as a predicate to imposing liability upon the controlling" defendant. *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 286 (3d Cir.2006).

**B.** *Request for a stay.*

■ Alternatively to dismissal, CSG requests that this Court stay the action pending "resolution by the Second Circuit" of CSS's appeal of the arbitration award "in accordance with normal, orderly appellate procedures." (Ltr. from L. Byrne, Dkt. # 53, at 2.) In the same vein, CSG argues that "this is essentially a collection action that becomes ripe only if [CSS] fails to pay any final non-appealable judgment." (Opp. to Mot. to Amend, Dkt. # 58, at 6.) These arguments, although somewhat inviting, are not persuasive.

■ "The decision whether or not to stay or dismiss a proceeding rests with-

---

10. In the unlikely event that the Second Circuit vacates the confirmation of the arbitration award, the Court expects that CSG will raise this development in defense to ST's claims.

in a district judge's discretion." *Adam v. Jacobs,* 950 F.2d 89, 92 (2d Cir.1991). "If cases involving substantially the same issues are filed in different district courts, generally the court hearing the second case should exercise its discretion to stay or dismiss its case in favor of the first-filed case, unless the balance of conveniences or other special circumstances suggest otherwise." *Tiffany & Co. Intern., Inc. v. Dhirim, Inc.,* 2009 WL 2569190, at *1 (S.D.N.Y. 2009) (refusing to stay confirmation of an arbitration award based on existence of prior lawsuit filed in separate district). As discussed above, the fact of a prior arbitration decision awarding Section 10(b) damages "does not bar litigation of the defendants' liability as controlling persons." *Boguslavsky,* 159 F.3d at 720. The issues in the two actions, moreover, are not substantially similar, in that only "issues [which] were not raised and, thus, could not have been resolved in the [FINRA] proceeding" may be litigated in this action. *Id.* at 720–21.

In this case, judicial economy mandates resolving ST's claim. Over time, employees leave, memories fade and documents disappear. For example, CSG allegedly has dismantled its Cash Management Group. In a separate action relating to Butler and Tzolov, moreover, CSG has argued that former employees residing outside of the judicial district could not be compelled to testify. In the meantime, ST alleges that it alone bears the growing costs of its devalued investments, including having to arrange for alternative financing without the half-billion dollars in formerly ready capital sitting frozen in its account. CSG's representing that CSS will pay the arbitration award if and when it becomes final, so as to justify a stay, is incompatible with its arguing that it cannot represent CSS's interests, so as to justify Rule 12(b)(7) dismissal. The action will proceed.

## IV. *Conclusion.*

For the above reasons, ST's motion to amend its complaint is granted and ST's Section 10(b), Section 20(a) and conversion claims may proceed. The Court denies as moot ST's request to modify the PSLRA discovery stay and directs the parties to proceed with discovery.

SO ORDERED.