443 F.3d 230
Frederick W. CRIGGER, DSMcKee Investments Inc., Jack Schueler, Eva Schueler and Csdesign, Inc., Plaintiffs-Counter-Defendants-Appellants,v.FAHNESTOCK AND COMPANY, INC. and Aurelio Vuono, Defendants-Appellees,Raymond Minicucci, Defendant,David S. McKee and Terry Wilkinson, Plaintiffs-Counter-Defendants,Momentum Investments Ltd., Plaintiff.Docket No. 05-2428 CV.
United States Court of Appeals, Second Circuit.
Argued: December 19, 2005.
Decided: March 29, 2006.

COPYRIGHT MATERIAL OMITTED Eric J. Grannis, Law Offices of Eric J. Grannis, New York, NY, for Plaintiffs-Counter-Defendants-Appellants.
Howard Wilson, Proskauer Rose LLP, New York, NY, for Defendant-Appellee Fahnestock and Company, Inc.
Before: JACOBS, STRAUB, and POOLER, Circuit Judges.
DENNIS JACOBS, Circuit Judge.
Victims of a Ponzi scheme brought suit for common law fraud against the schemers — Aurelio Vuono and Raymond Minicucci — and Fahnestock & Co. ("Fahnestock"), a financial institution that employed Minicucci and was used by him and Vuono as a financial intermediary. Although Minicucci had settled, his role was contested at trial in the context of Fahnestock's liability under the doctrine of respondeat superior. The jury found that plaintiffs failed to show by clear and convincing evidence that Vuono or Minicucci was liable for fraud; and having found no fraud by Minicucci, the jury did not reach the respondeat superior claim against Fahnestock. On April 25, 2005, the United States District Court for the Southern District of New York (Keenan, J.) entered judgment dismissing the complaint.

1
On appeal, plaintiffs Frederick W. Crigger, Jack Schueler, Eva Schueler, DS McKee Investments Inc., and CS Design, Inc. challenge the jury charge on the grounds that (1) it erroneously stated that plaintiffs had a duty of investigation triggered by their relative financial sophistication and by what they were told about the investment; and (2) it erroneously omitted an instruction on conspiracy to defraud and on aiding and abetting. In addition, they contest the receipt into evidence of a "memo to file" in which an accountant of one of the plaintiffs recorded his advice that the transaction should be approached with caution.

2
We affirm as to Fahnestock on the ground that the jury charge was sound and because the evidence richly supports a finding that plaintiffs failed to make inquiries commensurate with their sophistication, notwithstanding telltale signs that the investment was a Ponzi scheme or some other implausible kind of bonanza. We affirm as to Vuono on the same ground.

3
Moreover, we conclude that the district court properly chose to include no instruction on conspiracy or on aiding and abetting, and did not abuse its discretion by admitting the accountant's memorandum.

4
* Four Canadian computer programmers — Frederick Crigger, David McKee, Jack Schueler, and Terrence Wilkinson — became millionaires overnight in 1994 when their educational-software company was bought out. Prior to their (aggregate) investment of $8 million in the Ponzi scheme, the four invested actively in a variety of advanced financial products. Crigger, who in 1995 had a net worth of CAN$8 million, traded in options and commodities (including silver, soybeans, wheat, and corn), and invested in several real-estate and film-production tax shelters. McKee, who in 1995 had a net worth of CAN$3 million and had been an active investor for over ten years, invested in tax shelters, bought and sold equities on margin, invested in options contracts, bought shares at least once from a cold-calling broker, and (on the advice of his accountants) set up an investment company: DS McKee Investments Inc. Schueler, who in 1995 had a net worth of CAN$7 million, invested in stocks, certificates of deposit, mutual funds, tax shelters and a real-estate limited partnership. Wilkinson, who in 1995 had a net worth of CAN$3 million, worked with several stockbrokers, invested in mutual funds, speculated in stocks and commodities, and set up CS Design Inc. as his personal-investment company.

5
The evidence showed that Vuono was a principal in a company called Rayvon, and that he and Minicucci promoted the company to Crigger in Canada through Crigger's investment advisor, Jeffrey Mason, who (curiously) was not named as a defendant. Mason approached Crigger in January 1995, touting Rayvon as a safe investment with a guaranteed return of principal and an assured income stream of six to seven percent a month. Mason explained that this surefire arrangement was based on a hitherto undiscovered arbitrage opportunity that defendants had identified: Rayvon would use one-year U.S. Treasury bills as security for a loan from a brokerage firm (here, Fahnestock), the proceeds of which they would use to buy and sell certificates of deposit ("CDs") to banks in different countries; profit would be generated by arbitraging the spread in interest rates of the CDs.1 Mason emphasized to Crigger that the return of principal was guaranteed because Fahnestock would hold Crigger's proposed investment in a Fahnestock brokerage account pursuant to "Standing Instructions" that his investment would not be removed from the account and that Crigger could seek the return of his funds at any time.

6
Crigger invested $3 million in Rayvon the next month, even though Mason gave Crigger no prospectus or offering memorandum (or any other written materials), and even though the Standing Instructions that Crigger executed (1) gave Rayvon control of Crigger's Fahnestock account; (2) contained no assurance that his $3 million would be returned; and (3) provided only that he would receive the "proceeds" from the sale of the Treasury bills — i.e., what was left in his account after all the buying and selling of the CDs. Crigger undertook no independent inquiry and sought no outside financial counsel prior to investing.

7
In March 1995, the front end of the Ponzi scheme netted Crigger $210,000. Gratified, Crigger shared his business opportunity with two of his programmer-friends, McKee and Schueler; later, McKee shared the good news with Wilkinson. None of these individuals or their investment companies were given any more information about Rayvon than Crigger had received, but some took a closer look. Schueler and Wilkinson talked to Minicucci directly about the investment; and Wilkinson noticed that the Standing Instructions could be revoked and obtained an added clause. McKee discussed the Rayvon opportunity with his accountant, Jim McIlwham, who was alarmed by its speculative nature. In the end, Schueler invested $3 million, and McKee and Wilkinson each invested $1 million — all told, the plaintiffs invested $8 million.

8
The plaintiffs' periodic payments from the Rayvon investment ended in October 1995; soon after, they learned that their investment had disappeared. In January 2001, they filed suit in the United States District Court for the Southern District of New York. In April 2005, a jury trial was conducted on plaintiffs' common law fraud claim (the only claim that remained following partial grants of summary judgment), and the jury returned a verdict in favor of defendants.

II

9
Under New York law, the five elements of a fraud claim must be shown by clear and convincing evidence: (1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff. See Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir.1997).

10
Here, only the fourth element of common law fraud is at issue. Reasonable reliance entails a duty to investigate the legitimacy of an investment opportunity where "plaintiff was placed on guard or practically faced with the facts." Mallis v. Bankers Trust Co., 615 F.2d 68, 81 (2d Cir.1980), abrogated in part on other grounds by Peltz v. SHB Commodities, 115 F.3d 1082, 1090 (2d Cir.1997). Only "[w]hen matters are held to be peculiarly within defendant's knowledge[] [is it] said that plaintiff may rely without prosecuting an investigation, as he ha[d] no independent means of ascertaining the truth." Id. at 80. A plaintiff cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable reliance without making inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth about an investment:

11
Circumstances may be so suspicious as to suggest to a reasonably prudent plaintiff that the defendants' representations may be false, and that the plaintiff cannot reasonably rely on those representations, but rather must "make additional inquiry to determine their accuracy." Put another way, if the plaintiff "has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations."

12
Estate of Warhol, 119 F.3d at 98 (quoting Keywell Corp. v. Weinstein, 33 F.3d 159, 164 (2d Cir.1994); Mallis, 615 F.2d at 80-81).

13
The law is indulgent of the simple or untutored; but the greater the sophistication of the investor, the more inquiry that is required. "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2d Cir.1984). "In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir.2003) (citation omitted).

III

14
Plaintiffs contend that their defeat at trial is attributable to errors in the jury instructions. Specifically, plaintiffs take issue with the charge that plaintiffs were required to conduct some investigation of their investment before investing, and (relatedly) the court's refusal to charge that negligence is no bar to a claim of fraud.

15
We review jury instructions de novo "to determine whether the jury was misled about the correct legal standard or was otherwise inadequately informed of controlling law. A new trial is required if, considering the instruction as a whole, the cited errors were not harmless, but in fact prejudiced the objecting party." Jacques v. Di Marzio, Inc., 386 F.3d 192, 200 (2d Cir.2004) (quoting Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir.2001)) (internal quotation marks omitted).

16
In relevant part, the jury was charged as follows:

17
Defendants claim that the plaintiffs did not conduct a sufficient investigation. Defendants argue that the plaintiffs[—]each of whom had prior investment experience[—]knew nothing about Rayvon its principals or its history and received little material to explain the Rayvon investment.

18
The law is that a party will not be heard to complain that it has been defrauded when it is eviden[t] that its own lack of due care was responsible for its predicament.

19
The Plaintiffs argue that they did enough and did[] reasonably rely. Your job is to first determine whether the plaintiffs engaged in enough due diligence relative to their net worth and the resources potentially at their disposal to satisfy their burden of diligently asking questions.

20
If you find that the plaintiffs reasonably relied on Vuono's and Minicucci's false representations you must then determine if that plaintiff was damaged as a result of such reliance.

21
* * * * * *

22
If you find that the elements of fraud have been proven by clear and convincing evidence against Minicucci this does not automatically impose liability on Fahnestock. Not all actions of an employee create liability for the employer. The rule is called the doctrine of respondeat superior....

23
In light of the evidence adduced at trial, the district court did not mislead the jury as to the correct legal standard applicable to the case. There was ample evidence that the Rayvon investment opportunity was a Ponzi scheme and that investors of reasonable means and prudence (such as plaintiffs) thus bore a legal duty at least to inquire further — just as the district court charged. The evidence justifying the district court's charge included proof that:

24
• Each of the plaintiffs had substantial and varied experience with millions in investments, and had worked with brokers, financial advisors, or accountants prior to investing in Rayvon;

25
• None of the plaintiffs except McKee and DSMcKee Investments Inc. consulted any advisor about the extraordinary returns or any other aspects of the investment opportunity, and they failed to heed the accountant's warning;

26
• Plaintiffs were told to make no unauthorized direct contact with Fahnestock or Rayvon (or any other party involved), on pain of being "automatically disqualified" from participation;

27
• The sales pitch — a one-page description contained in the so-called "Investment Programme" — promised a guaranteed return of six percent per month (an eyebrow-raising 72% per year); Crigger was promised seven percent per month, or 84% per year; and the 12% difference was unexplained;

28
• No plaintiff was given a prospectus, an offering memorandum, financial statements, or written materials detailing the opportunity; and

29
• Each of the plaintiffs testified at trial that Rayvon was something along the lines of "too good to be true," or "pretty amazing."

30
These circumstances created a fact question as to whether these sophisticated investors, exercising reasonable prudence, should have been sufficiently alerted to look into the legitimacy of the proposed transactions, and avoid the loss. Mallis, 615 F.2d at 81; see also Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1541 (2d Cir.1997). The jury charge accurately and clearly set out plaintiffs' duty of investigation, given the suspicious circumstances and the plaintiffs' savvy. And the jury evidently decided that plaintiffs failed to investigate the Rayvon investment in a manner commensurate with their level of sophistication.2

31
The district court declined to charge the jury, as plaintiffs requested, that under New York law a plaintiff's negligence is no bar to a fraud claim. Such a charge in this case, however, would run counter to the principle, discussed above, that New York law generally requires a plaintiff to employ such wit and experience as he has to look into an investment when the circumstances would alert such an investor to pause and inquire. See Estate of Warhol, 119 F.3d at 98; Mallis, 615 F.2d at 80-81.

32
The claim against Fahnestock, premised on the doctrine of respondeat superior, was defeated by the finding of a properly charged jury that Minicucci (as a duly authorized employee of Fahnestock) committed no fraud on which these plaintiffs could recover.3

33
Plaintiffs' appeal of the jury charge with respect to Vuono fails for the same reason: In light of the evidence presented at trial, the district court enunciated the correct legal standard for New York State common law fraud.

IV

34
The district court refused plaintiffs' request to charge the jury on conspiracy to defraud or on aiding and abetting the fraud. The aiding and abetting charge was properly omitted because that legal theory was not pleaded in the complaint. And because the jury found there was no fraud, it is a moot question whether the district court should have charged the jury on conspiracy to defraud. See Vasile v. Dean Witter Reynolds Inc., 20 F.Supp.2d 465, 482 (E.D.N.Y.1998), aff'd, 205 F.3d 1327 (2d Cir.2000) ("[U]nder New York law, civil conspiracy to commit fraud, standing alone, is not actionable... if the underlying independent tort has not been adequately pleaded." (internal quotation marks and citation omitted)); see generally 20 N.Y. Jur.2d, Conspiracy — Civ. Aspects § 1 (2005) ("The essence of the cause of action for civil conspiracy is the tortious conduct of the defendants; therefore the dismissal of the underlying substantive cause of action also requires the dismissal of the accompanying charges of conspiracy based on the same facts or allegations.").

V

35
Plaintiffs next argue that the district court admitted hearsay in violation of Rule 801(d)(2)(D), Fed.R.Evid., by allowing, over plaintiffs' objection, the introduction of an internal "memo to file" written by Jim McIlwham, the accountant for David McKee and his company, DSMcKee Investments Inc.4 The subject reference of the memorandum is the client's "Personal Tax Matter," and states in relevant part:

36
Dave called me on March 14th to discuss an investment he was considering making. His company would invest money in an equity account in his company's name, funds would be managed by someone else.... He would not give me further details about the potential investment as it was confidential. I continue to be concerned with the investment risks that he is taking and told him so. I also told him to walk away if he had any doubts or concerns about this investment. I also asked him if anything illegal might be involved, and he told me no.

37
We review a district court's evidentiary rulings for abuse of discretion and will reverse only if it affects a party's substantial rights. Marcic v. Reinauer Transp. Cos., 397 F.3d 120, 124 (2d Cir. 2005). An erroneous evidentiary ruling affects substantial rights only when, considering the record as a whole, it had a "substantial and injurious effect or influence" on the jury's verdict. United States v. Garcia, 413 F.3d 201, 210 (2d Cir.2005) (quoting United States v. Dukagjini, 326 F.3d 45, 62 (2d Cir.2003)) (internal quotation marks omitted).

38
In order for evidence to be admissible pursuant to Rule 802(d)(2)(D), the proponent of the evidence must establish "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." Pappas v. Middle Earth Condominium Ass'n, 963 F.2d 534, 537 (2d Cir.1992).

39
Plaintiffs urge that the district court improperly admitted the memo because McIlwham, as McKee's accountant, was not his agent, but rather he was an independent contractor. Even if McIlwham were McKee's agent, plaintiffs maintain, the memo was not written in the course of McKee's agency. However, even if the district court exceeded its discretion in admitting the memo, we cannot say that it affected plaintiffs' substantial rights given the evidence recounted above establishing that plaintiffs imprudently raced past many red flags to invest in Rayvon. The mere fact that defense counsel punctuated his closing argument with reference to the memo does not marginalize the other evidence upon which the jury relied.

40
For the foregoing reasons, the judgment of the district court is affirmed.

Notes:

1
Do not try this at home

2
A swindled plaintiff who fails to undertake the requisite level of investigation before investing in a Ponzi scheme is not foreclosed from a contract claim or other remedies

3
The Court does not address whether the jury was properly charged on the doctrine ofrespondeat superior as to Fahnestock, because plaintiffs have not appealed that issue. See Pelman ex rel. Pelman v. McDonald's Corp., 396 F.3d 508, 511 (2d Cir.2005); Rule 28(a), Fed. R.App. P.

4
Rule 801(d)(2)(D) reads:
[A] statement is not hearsay if ... [t]he statement is offered against a party and is... (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship....