10-3847-cv
STMicroelectronics, N.V. v. Credit Suisse Securities (USA)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————————

August Term, 2010

(Argued: March 28, 2011    Decided: June 2, 2011)

Docket No. 10-3847-cv

————————————

STMICROELECTRONICS, N.V.,

*Petitioner-Appellee*,

— v.—

CREDIT SUISSE SECURITIES (USA) LLC,

*Respondent-Appellant*.

————————————

B e f o r e:

SACK and LYNCH, *Circuit Judges*, and PRESKA, *District Judge*.[*]

_____

Appeal from orders of the United States District Court for the Southern District of New York (Deborah A. Batts, *Judge*) that (1) confirmed an arbitral award and denied a motion to vacate the award, and (2) denied in relevant part the Respondent-Appellant's motion to alter or amend the prior judgment. We affirm the district court's confirmation

---

[*] The Honorable Loretta A. Preska, Chief Judge of the United States District Court for the Southern District of New York, sitting by designation.

of the award and its rejection of claims of improper disclosure by an arbitrator and manifest disregard of the law. We also affirm the district court's treatment of interest accruing on securities after December 31, 2008. We hold, however, that the district court should have modified the judgment to account for money received in a partial liquidation of the portfolio at issue in this case.

AFFIRMED IN PART, VACATED IN PART.

––––––––––

ANDREW L. FREY (Philip Allen Lacovara, Mark G. Hanchet, S. Christopher Provenzano, Christopher J. Houpt, *on the brief*), Mayer Brown LLP, New York, New York, *for Respondent-Appellant Credit Suisse Securities (USA).*

BARRY LEVENSTAM, Chicago, Illinois (Andrew Weissmann, Elizabeth Edmondson, Elisabeth Genn, Danielle Tarantolo, New York, New York, *on the brief*), Jenner & Block LLP, *for Petitioner-Appellee STMicroelectronics, N.V*.

––––––––––

GERARD E. LYNCH, *Circuit Judge*:

Credit Suisse Securities (USA) LLC ("Credit Suisse")[1] is a member of the Financial Industry Regulatory Authority (FINRA), and Credit Suisse's form "New Account Agreement" includes a clause requiring its customers to submit all disputes to

---

[1] We adopt this shorthand to refer to the respondent entity only, for convenience and clarity. Our use of "Credit Suisse" does not imply any stance on the liability of any other entity for any of the actions in this case, an issue ST has raised in a suit against Credit Suisse Group, the parent company of Credit Suisse Securities (USA) LLC. See STMicroelectronics, N.V. v. Credit Suisse Group, No. 08-cv-03201-RJD-RML, 2011 WL 1238817 (E.D.N.Y. Mar. 31, 2011).

FINRA arbitration. When, however, Credit Suisse lost a major FINRA arbitration against a customer, STMicroelectronics, N.V. ("ST"), Credit Suisse attacked the arbitrators for various improprieties and asked the district court and now this Court to undo the award. We have given Credit Suisse's attacks on the arbitral award careful attention and find them without merit. We therefore uphold confirmation of the award in full.

We do agree with Credit Suisse on one point, however, relating not to validity of the arbitration award but to its implementation in the federal courts. We hold that the district court's judgment should have credited Credit Suisse for approximately $75 million that ST received in exchange for selling some of the failed auction rate securities at issue in this case, and should have reduced Credit Suisse's liability for interest accordingly. We therefore vacate the district court's judgment on that point and remand for modification in light of the partial satisfaction of the award. We reject, however, Credit Suisse's attempt to alter the award's scheme for distributing interest earned on the securities portfolio.

## BACKGROUND

ST manufactures semiconductors. The cyclical nature of its business requires the company to have a large amount of cash or cash equivalents on hand to meet its needs. Until early 2006, ST invested this cash only in money market deposits and floating rate notes, investments chosen for their safety and liquidity.

In April 2006, Credit Suisse approached ST offering another type of investment, called auction rate securities ("ARS"), that Credit Suisse promised would meet these

3

specifications while maintaining "an attractive yield advantage over other short-term vehicles." ARS are debt instruments whose interest rates are reset by auctions at periodic intervals. Credit Suisse explicitly proposed, and ST explicitly accepted, investing only in ARS that are backed by federally guaranteed student loans.

Credit Suisse stuck to this plan for only a few days. Almost immediately, it began buying other types of ARS for the account. Those securities, while carrying a higher yield (and a higher average commission for Credit Suisse), had no government guarantee. By November 2006, the account contained *no* government-backed ARS, and after January 2007 none of Credit Suisse's purchases for the account involved student loans at all, guaranteed or not. Instead, Credit Suisse bought ARS backed by collateralized debt obligations ("CDOs") and credit-linked notes ("CLNs"), which in turn were backed by a wide variety of assets, some of which turned out to be risky. To cover their tracks, the Credit Suisse brokers responsible for the account sent deliberately false email confirmations to ST in which they replaced words in the names of securities that identified them as CDOs or CLNs with more neutral terms like "funding" and often flatly inaccurate terms like "Student Loan."[2]

In July 2007, an ST employee noticed that Credit Suisse had purchased securities

---

[2] ST also received paper records that were accurate because they came directly from the clearing agent rather than from Credit Suisse. ST relied on the email confirmations, however, and claimed that the paper records arrived too late to be useful. ST asked for a better way to access current information about its accounts but Credit Suisse never provided one.

that deviated from its instructions, and asked Credit Suisse to "stick to the mandate to buy only Student Loan [ARS]." Although Credit Suisse did cancel one transaction, and although it reaffirmed its promise that it would invest ST's funds in "Aaa/AAA rated student loan paper," it nevertheless continued to buy ARS based on un-guaranteed CDOs and CLNs, and continued to send ST email confirmations hiding the true nature of those investments. Credit Suisse did so in the face of ST's increasingly vehement instructions not to buy non-government-backed ARS and to sell the ARS it already owned. For these actions and others, the two Credit Suisse brokers responsible for ST's account were later convicted, one by plea and one by jury verdict, of securities fraud and related conspiracy charges.[3]

In August 2007, the ARS market began to fall apart. Some auctions failed to draw enough investors to bid on all the relevant securities, making them hard if not impossible to sell. A Credit Suisse executive reassured ST about its investments, but by September 2007, *all* of ST's ARS – worth over $400 million – had failed at auction. This significantly reduced both the value of the ARS and their utility to ST as a highly liquid cash equivalent.

In February 2008, ST filed an arbitration claim against Credit Suisse with FINRA, which operates "the largest securities dispute resolution forum in the world" and which counts Credit Suisse among its member institutions. Credit Suisse had provided for

---

[3] The latter broker's appeal is now pending. See United States v. Tzolov (Butler), No. 10-562 (2d Cir.).

arbitration with the National Association of Securities Dealers, FINRA's predecessor, in the New Account Agreement it provided to ST. ST sought arbitration under this provision, raising federal claims of securities fraud under § 10(b)(5) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, as well as state-law claims of fraud, intentional misrepresentation, fraudulent concealment, breach of contract, breach of fiduciary duty, breach of the duty of good faith and fair dealing, unjust enrichment, unsuitability, unauthorized transactions, and (after amending its complaint) failure to supervise.

FINRA rules provided that the parties would have three arbitrators to decide their case: two "public arbitrators" who must be unattached to the securities industry and one "non-public arbitrator" chosen for industry experience and knowledge. See FINRA Rules 12100(p), (u), 12401(c), 12403. FINRA provided the parties with lists of possible arbitrators in the relevant categories along with standard disclosure reports for each one, allowing the parties to strike arbitrators at their discretion and rank the remaining ones in each category according to their preferences. The parties were unable to select a full panel on the first try and requested another slate of candidates who possessed more experience dealing with the types of claims involved. On the second try, the parties successfully selected a panel and proceeded to arbitration.

Midway through the hearings, however, Credit Suisse sought to remove one of the three arbitrators, John J. Duval, Sr., alleging that he had served as an expert witness primarily for customers arbitrating against financial firms but that he had painted a more

6

balanced picture of his experience on his disclosure report and that he had failed to disclose prior expert testimony on certain issues relevant to ST's case. Duval, with the support of the chair of the panel, refused to step down, noting that he had worked more often on the side of the financial industry than Credit Suisse had suggested he had and declaring that "there is no doubt in my mind that I can render a fair and unbiased opinion." Credit Suisse next petitioned FINRA to remove him, but FINRA's Director of Arbitration denied this request.

Finally, in February 2009, after four days of pre-hearing conferences, fifteen days of hearings, and voluminous briefing from both sides, the arbitration panel ruled unanimously in favor of ST. The arbitrators' award effectively undid the trades: ST would return the failed securities (with a par value of $414,975,000) to Credit Suisse upon the latter's payment of $400 million in compensatory damages, plus $1.5 million in financing fees, $3 million to cover ST's attorneys and expert witnesses, and interest (offset, at least prior to December 31, 2008, by the amount of interest the securities paid to ST). These figures, though substantial, were all lower than the amounts ST had requested in each category.

ST quickly petitioned to confirm the award in the Southern District of New York. Credit Suisse opposed ST's petition and sought to vacate the award on the basis of Duval's purportedly misleading or insufficient disclosure and also because of the arbitrators' alleged "manifest disregard of the law." See Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 388-90 (2d Cir. 2003) (discussing vacatur of

7

arbitral awards for manifest disregard).  In March 2010, the district court rejected Credit Suisse's arguments and confirmed the award.

Meanwhile, after the parties had completed briefing but before the district court issued its March 2010 confirmation order, Deutsche Bank offered to purchase some of the securities in the account.  At Credit Suisse's urging, ST accepted the offer and sold securities with a face value of $153,500,000 for $74,582,000 in cash.  When the district court's March 2010 order came out, Credit Suisse moved to amend the judgment to offset its obligation to ST (and more importantly the interest it owed on that obligation) by the roughly $75 million ST had received from the Deutsche Bank sale.  Credit Suisse also sought several other modifications to the judgment, including offsetting the interest it owed on the award by the interest ST was receiving on the securities after December 31, 2008.  (The award provided such an offset before but not after that date.)  The district court granted Credit Suisse some of the modifications it sought but rejected both its request to account for the Deutsche Bank payment and its attempt to offset the post-December 31, 2008, interest payments with the interest ST receives on the securities portfolio.  Credit Suisse appeals.

## DISCUSSION

I.  **Arbitrator Disclosure**

Credit Suisse first argues that we should vacate the award because arbitrator Duval provided incomplete and inaccurate disclosures to the parties before they selected him for the arbitration panel.  Specifically, Credit Suisse contends that, "[w]hile Duval has served

8

extensively and almost exclusively as a professional claimant-side expert witness [that is, as a witness for customers arbitrating against financial firms], his disclosure report omitted all but a brief reference to his claimant-side experience and instead misleadingly stated that he worked for 'both sides.'" Credit Suisse further contends that Duval "chose not to disclose that he had served as a claimant-side expert witness on an issue very similar to the one that would determine the arbitration."

As we have previously noted, "[a] party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high." D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006). Credit Suisse has not met this burden.

Following issuance of an arbitration award, § 9 of the Federal Arbitration Act ("FAA") provides that a party may apply to a district court "for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. Section 10 of the FAA, in turn, lists grounds for vacating an order, see Hall Street Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 582 (2008), including, most relevantly to this argument, "evident partiality or corruption in the arbitrators" and "other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(2), (3).

During arbitration, Credit Suisse invoked the first of these provisions, complaining that Duval's incomplete disclosure demonstrated "evident partiality." Cf. 9 U.S.C. § 10(a)(2); Commonwealth Coatings Corp. v. Cont'l Cas. Co., 393 U.S. 145, 147 (1968).

9

Before the district court and this Court, however, Credit Suisse maintains the same objection but shifts to a more novel theory, disclaiming "evident partiality" and instead relying on the FAA's catch-all for "other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3). Credit Suisse does not cite any cases, nor are we aware of any, that have addressed claims of insufficient disclosure under the "other misbehavior" prong.

There is a reason for Credit Suisse's switch: as it now acknowledges, the decisions under § 10(a)(2)'s "evident partiality" provision have "addresse[d] non-disclosure only of facts bearing on *partiality* – namely, a relationship with a party, a lawyer, or another arbitrator." Credit Suisse's contention, however, is that Duval failed to disclose (and, in fact, affirmatively misrepresented) facts bearing not on partiality but on an alleged *predisposition*. No one alleges that Duval concealed any relationship with one of the parties, whether financial, familial, or otherwise. Rather, Credit Suisse argues that Duval's experience as an expert for claimants either colored his outlook in their favor or demonstrates that his outlook was already so colored and that, either way, Credit Suisse was entitled to know about that experience before selecting him as an arbitrator. Credit Suisse contends that Duval's disclosure report misled Credit Suisse about his experience in violation of the FINRA Rules, thereby entitling Credit Suisse to vacate the award for "other misbehavior" under § 10(a)(3). ST responds that Duval did not violate the FINRA rules and that, even if he had, § 10(a)(3) is not available for violations of arbitration rules or for failure to disclose generally.

10

We may reject Credit Suisse's claim without diving too deeply into these difficult legal waters. Close consideration turns up very little factual support for Credit Suisse's claim of improper disclosure – too little to vacate the award under any conceivable legal standard.

Duval's "Arbitrator Disclosure Report" describes a twenty-two-year career in finance, primarily with Merrill Lynch, and explains that he now works as an arbitrator and is "also a Litigation Consultant and an expert witness having represented both sides." A section of the report entitled "Disclosure/Conflict Information" lists a variety of information, including banks with which Duval maintains an account, securities licenses he holds, and the like. In relevant part, it repeats Duval's statement that he has worked as an expert and consultant for "both sides" and provides two specific examples of such work, one where he was an expert or consultant for Wachovia Securities and one where he testified against the same company.

Credit Suisse argues that Duval should have disclosed more of his work as an expert for claimants (that is, customers) than his disclosure report reflected. During the arbitration, Duval mentioned offhand that he had "testified a lot in cases as an expert." Credit Suisse says this remark led it to investigate Duval's background and to learn that Duval had stated, in 2005, that he had testified more than twenty-five times as an expert, only "once or twice for respondents [that is, financial institutions] and the balance for claimants." Attacking Duval's experience as "one-sided," Credit Suisse argues that Duval misled it when he described his experience as representing "both sides" and listed

11

only one representation on each side.

Credit Suisse's characterization of Duval's experience, however, is incomplete. When Credit Suisse asked him to recuse himself in the middle of a day of hearings, Duval responded that Credit Suisse's figures were "underreported" and that he had "had numerous cases where [he] was retained by [a] respondent, but [that had] settled. They didn't make it to a hearing." He further elaborated that "a respondent firm recently hired [him] to do a mediation," and that he was "under retainer by a large . . . wire house at present, and . . . probably will testify for them." Credit Suisse's briefs largely ignore this explanation, instead focusing wholly on the 2005 statement, which is both less complete (because it describes only times Duval testified and does not include other expert or consulting work) and less up to date (because it does not include Duval's experience in the three years between 2005 and the arbitration in this case).

Given the "very high" showing necessary to vacate an award, D.H. Blair, 462 F.3d at 110, we would expect Credit Suisse to present more evidence to support its contentions about Duval's background. It appears, however, that Credit Suisse never asked Duval for an accounting of his experience, either before or during the arbitration or during the district court proceedings. Although we have limited the availability of discovery regarding the completeness of an arbitrator's disclosures, we have not forbidden it altogether. See Andros Compania Maritima, S.A. v. Marc Rich & Co., 579 F.2d 691, 702 (2d Cir. 1978); Sanko S.S. Co. v. Cook Indus., Inc., 495 F.2d 1260, 1263 (2d Cir. 1973); see also Hoeft v. MVL Group, Inc., 343 F.3d 57, 66-67 (2d Cir. 2003) (stating in dicta

that arbitrators may be deposed on issue of bias), <u>overruled on other grounds by</u> <u>Hall</u>

<u>Street Assocs.</u>, 552 U.S. 576.  That Credit Suisse made no further inquiries in either

forum is telling.[4]

The lack of evidence means we cannot know exactly how much work Duval did or

for whom. But that was Credit Suisse's burden to show, and it has failed to carry it.  At

the very least, even if we assume that Duval has worked for many more claimants than

respondents, his work for "numerous" respondents and his ability to cite two respondents

employing him at the time of the 2008 arbitration belie Credit Suisse's contention that he

"served . . . almost exclusively as a professional claimant-side expert witness."

With this understanding of the record, we see no ground upon which to vacate the

award because of Duval's disclosures.  Even if we assume several hotly contested legal

issues in Credit Suisse's favor – that the "other misbehavior" clause in 9 U.S.C.

§ 10(a)(3) extends to insufficient disclosure, that violation of the FINRA rules necessarily

constitutes such "other misbehavior," and that a one-sided employment history

demonstrates a predisposition that must be disclosed under that provision or some other –

Credit Suisse's claim still fails.  Credit Suisse has not shown that Duval's experience was

one-sided.  Failure to disclose Duval's full experience thus could not have been

"misbehavior" of any sort, much less the "other misbehavior" that would trigger

---

[4]  Notably, Credit Suisse did suggest an evidentiary hearing below on what *it* knew about Duval's experience – to counter hints that it had known the full extent of his background all along – but never made any suggestion about investigating Duval's experience itself.

§ 10(a)(3).

Moreover, Credit Suisse cites no FINRA rule that Duval's disclosures violate. In fact, it specifically disclaims any contention that FINRA Rule 12405(a) – which governs arbitrator disclosures – "by itself required disclosure of details about Duval's expert engagements." The wisdom of this conclusion is confirmed both by FINRA's own explications of its rules and by its application of those rules in this case. A FINRA publication, under the heading "Arbitrator Tip: Disclosure and Acting as an Expert," suggests that "all arbitrators who act as experts include – at a minimum – a sentence (filling in the appropriate type of party) in their background paragraph such as: 'I have been an expert witness for (customers/brokerage firms/brokers, or associated persons).'" Duval included exactly this sort of statement here, accurately describing himself as a "Litigation Consultant and an expert witness having represented both sides." The same publication states that "[a]rbitrators *may also* wish to provide an estimate of the number of times they acted as an expert for customers, registered representatives or broker-dealers." (Emphasis added.) But it does not say they *must* do so. It is no surprise, therefore, that FINRA's Director of Arbitration found no reason to remove Duval from the panel after "review[ing]" Credit Suisse's allegations.

Credit Suisse makes two arguments in response. First, it argues that Duval's disclosure report was not just incomplete but affirmatively misleading because it included two engagements as an expert witness – one for Wachovia Securities, one against it – and no others. Credit Suisse admits this disclosure was factually true, but alleges that it was

14

aimed to create a false "appearance of neutrality."  As discussed above, however, Credit Suisse has failed to show that Duval's experience was sufficiently one-sided to cast doubt on that appearance.

Second, Credit Suisse points to the FINRA arbitrator application form, which includes some questions about prior expert work, and argues that Duval failed in his disclosure obligations (or otherwise committed "misbehavior") by failing to include all his prior expert service on that application.  That application form, however, is not a document prepared with reference to any particular matter.  Rather, it is the *initial* form that potential arbitrators must file to get on the FINRA roster of candidates.  Moreover, Credit Suisse does not provide a copy of the form actually executed by Duval; it provides only a blank copy of the form, without connecting the dots between that form and Duval's disclosures.  Specifically, Credit Suisse provides no evidence (a) that the form it cites is the source of the information in the arbitrator's disclosure report provided to the parties by FINRA; (b) that, if it is the source of the disclosure report, every bit of information provided by a potential arbitrator in that form ends up on the report, rather than only a selection of information that the arbitrator or FINRA administrators think relevant; or (c) that the form it cites, which dates from November 2008, contains the same questions that were asked when Duval applied to be an arbitrator before FINRA even existed, or even when Duval's disclosure form was released to the parties at least several months before the date of the application form Credit Suisse provides.  Lacking all these facts, we cannot infer that Duval failed to meet any disclosure obligations.

15

Finally, Credit Suisse adds another twist to its improper-disclosure case, arguing that Duval should have alerted Credit Suisse that he had previously testified as an expert on legal issues similar to some of those at issue in this case. This argument suffers from evidentiary deficiencies similar to those of Credit Suisse's other arguments: Credit Suisse provides only nine pages of testimony, without context about the case or about Duval's testimony. The testimony Credit Suisse cites involves a customer's duty to read a prospectus. This issue may relate to a legal issue here, involving whether ST should have read both the trade confirmations it received by email and the account statements it received in hard copy. But without context it is hard to evaluate the relevance of Duval's prior testimony.

More fundamentally, the major premise of Credit Suisse's attack on Duval's non-disclosure of his prior testimony fails. There is no contention here that Duval had any prior knowledge of, or misconception about, the facts of this case. Credit Suisse's argument, rather, is that his testimony suggests he had pre-existing views about potentially relevant propositions *of law*. However, "[a] judge's lack of predisposition regarding the relevant legal issues in a case has never been thought a necessary component of equal justice, and with good reason. For one thing, it is virtually impossible to find a judge who does not have preconceptions about the law." Repub. Party of Minn. v. White, 536 U.S. 765, 777 (2002). This is all the more true for arbitrators, "[t]he most sought-after" of whom "are those who are prominent and experienced members of the specific business community in which the dispute to be

16

arbitrated arose." Int'l Produce, Inc. v. A/S Rosshavet, 638 F.2d 548, 552 (2d Cir. 1981).

Arbitrator Duval played that very role on this panel, as the "non-public arbitrator" specifically chosen for his industry connection.[5] See FINRA Rule 12100(p). It would be strange if such an arbitrator were forced to search the record of all prior testimony for any statement that might – however tangentially – relate to any of the many legal issues that might arise in any given case. A party might like to know that information when shopping for arbitrators, but its absence cannot form a ground for vacating an arbitral award. The rule for which Credit Suisse contends finds no support in the text of the FAA or the case law, and we reject it.

## II.   **Manifest Disregard of the Law**

Credit Suisse next argues that the arbitrators manifestly disregarded the law in reaching their decision. See T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 339 (2d Cir. 2010). Reviewing the issue de novo, see id., we reject Credit Suisse's arguments and affirm the district court's ruling.

We have held that we may vacate an arbitral award not only on the grounds enumerated in § 10 but also if the award "manifest[s a] disregard of the law." Porzig v.

---

[5]   To the extent that there has been controversy over the role of the non-public arbitrator, the usual complaint is that such arbitrators have been too friendly toward *brokerages*, not toward *customers*. See, e.g., Bradley J. Bondi, Facilitating Economic Recovery & Sustainable Growth Through Reform of the Securities Class-Action System: Exploring Arbitration as an Alternative to Litigation, 33 Harv. J. L. & Pub. Pol'y 607, 630-31 (2010). FINRA has responded to these concerns by experimenting with the option of replacing the non-public arbitrator with another public arbitrator. See id. This case does not require us to take any position on the desirability of using industry-connected arbitrators.

17

Dresdner, Kleinwort, Benson, N. Am. LLC, 497 F.3d 133, 138 (2d Cir. 2007). Our review in this regard, however, is "highly deferential" to the arbitrators, and relief on such a claim is therefore "rare." Id. More searching review would "frustrate[] the basic purpose of arbitration, which is to dispose of disputes quickly and avoid the expense and delay of extended court proceedings," Saxis S.S. Co. v. Multifacs Int'l Traders, Inc., 375 F.2d 577, 582 (2d Cir. 1967); it "would make an award the commencement, not the end, of litigation," Burchell v. Marsh, 58 U.S. (17 How.) 344, 349 (1854). We therefore will not vacate an award because of "a simple error in law or a failure by the arbitrators to understand or apply it" but only when a party clearly demonstrates "that the panel intentionally defied the law." Duferco, 333 F.3d at 389, 393; cf. Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1767 (2010). Where, as here, the arbitrators do not explain the reason for their decision, we will uphold it if we can discern any valid ground for it. See Duferco, 333 F.3d at 390.

Some have expressed skepticism about the validity of our "manifest disregard" doctrine in light of recent Supreme Court precedent. See, e.g., T.Co Metals, 592 F.3d at 338-40, citing Hall Street, 552 U.S. 576. We need not, however, decide "whether manifest disregard survives . . . [either] as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10." Stolt-Nielsen, 130 S. Ct. at 1768 n.3 (quotation marks omitted). Even if we assume the survival of the standard, Credit Suisse has failed to meet it by a long shot. See T.Co Metals, 592 F.3d at 339-40.

18

Most glaringly, Credit Suisse attacks only ST's fraud-based claims, ignoring other claims that ST raised before the arbitrators, including breach of contract, breach of fiduciary duty, breach of the duty of good faith and fair dealing, unjust enrichment, and failure to supervise. We have stated that, "where an arbitral award contains more than one plausible reading, manifest disregard cannot be found if at least one of the readings yields a legally correct justification for the outcome." Duferco, 333 F.3d at 390. Because ST's award does not specify the claim(s) upon which it rests, Credit Suisse must show manifest disregard of the law for *all* the claims. Credit Suisse, however, provides no analysis whatsoever of the legal viability of any of ST's claims not sounding in fraud. Indeed, it cites only decisions in fraud cases, providing no authority for applying the same rules to other types of claims. And at least one of the precedents that Credit Suisse cites limited its holding to the fraud-based legal theory before it and stated that a similar plaintiff would not be "foreclosed from a contract claim or other remedies." Crigger v. Fahnestock & Co., 443 F.3d 230, 236 n.2 (2d Cir. 2006). This disclaimer, although dictum, defeats any argument that the panel would have manifestly disregarded Crigger by awarding relief on ST's contract claim. Even for the precedents lacking such specific disclaimers, Credit Suisse cannot show manifest disregard because it does not show that their holdings would apply to claims unrelated to fraud.

Even ignoring this hole in Credit Suisse's argument, and looking only to the claims sounding in fraud, we still find no manifest disregard. To show such disregard, Credit Suisse must first point to law that is "well defined, explicit, and clearly applicable" to the

19

case.  Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 934 (2d Cir. 1986).  Credit Suisse points to two different lines of precedent it says that the panel disregarded.  But these precedents are inherently fact bound; while one can extrapolate broader principles from them, it does not follow that all cases dealing with similar issues must reach the same result.  Rather, such decisions are naturally open to distinction.  And because we here review an arbitration award rather than the judgment of a district court, we do not require that a potential distinction be correct, only that it be at least "barely colorable."  T.Co Metals, 592 F.3d at 339 (quotation marks and emphasis omitted).

Credit Suisse first claims that the arbitrators manifestly disregarded this Court's holding in Modern Settings, Inc. v. Prudential-Bache Securities, Inc., 936 F.2d 640 (2d Cir. 1991).  In that case, a customer sued his broker under the anti-fraud provisions of the Securities Exchange Act of 1934 because the broker had promised to sell certain options while actually buying more of them, and the broker responded that the customer had not objected to the trades in writing within ten days of receiving his account statements, as required by a provision in the contract between them.  Id. at 642-45.  We held in favor of the broker, noting that "broker-customer agreements requiring written notice of objection within a limited amount of time after the customer receives confirmation of the transaction generally have been enforced by courts."  Id. at 646.  The arbitrators must have manifestly disregarded Modern Settings, Credit Suisse argues, by ruling in ST's favor despite a similar notice-of-objection clause in the agreement stating that "[r]eports of the execution of orders and statements of the account . . . shall be conclusive if not

20

objected to in writing, the former within two days and the latter within ten days, after

forwarding . . . by mail or otherwise."

Modern Settings, however, does not set out a rule that is "well defined, explicit,

and clearly applicable," as we have required in manifest-disregard cases. Merrill Lynch,

808 F.2d at 934. Modern Settings stated only that notice-of-objection clauses are

"*generally* . . . enforced," and proposed several possible (but nonexclusive) exceptions to

this principle. 936 F.2d at 646 (emphasis added); see Kurke v. Oscar Gruss & Son, Inc.,

454 F.3d 350, 355-56 (D.C. Cir. 2006); Gwynn v. Clubine, 302 F. Supp. 2d 151, 164

(W.D.N.Y. 2004). The arbitrators did not manifestly disregard Modern Settings so long

as they could have distinguished this case from that one on its facts. Cf. Williams v.

Taylor, 529 U.S. 362, 405 (2000) (holding that a state-court decision is "contrary to

[Supreme Court] precedent if the state court confronts facts that are materially

indistinguishable . . . and arrives at a result opposite to ours.").

The similarity between this case and Modern Settings does not go much further

than the fact that both involve similar notice-of-objection clauses. It is therefore possible

to distinguish Modern Settings on multiple grounds, all at least plausible – though we do

not rule on their correctness.[6] First, while the Modern Settings plaintiffs received only

_____

[6] We note again that Credit Suisse could have chosen to permit its customers to resolve disputes in the courts, where legal issues such as these could be authoritatively resolved. It deliberately chose, however, to insist on a forum in which issues are resolved less formally, without the necessity for the adjudicator to explain its precise reasoning or the availability of appellate tribunals to review and assess that reasoning. Having chosen that process, with its attendant expedition and lower cost, Credit Suisse may not now impose on its adversary the very formalities it elected to eschew, simply because it does not like the

accurate statements, see id. at 645, in this case ST received not one but two sets of "reports of the execution of orders," one accurate and one false, making it harder to call either set "conclusive" under the notice-of-objection clause. Second, and relatedly, Modern Settings specifically did "not foreclose the possibility that a broker may be estopped from raising a defense based on the written notice clause if the broker's own assurances or deceptive acts forestall the customer's filing of the required written complaint," id.; this case, where the brokers sent ST false email confirmations and other false assurances, could merit such estoppel.

Third, ST objected in writing, while the Modern Settings plaintiffs did not. See id. Credit Suisse argues that ST's initial objections were not specific enough; Credit Suisse was entitled to argue this point to the arbitrators, but even general objections distinguish this case from Modern Settings, in which there were no written objections at all. At the very least, ST's initial complaint about Credit Suisse's rogue trading and its instruction to "stick to the mandate to buy only Student Loan [ARS]" fulfilled the purposes of the notice-of-objection clause: by making these objections before the market collapsed, ST "memorialize[d] [its] complaint soon . . . rather than waiting to see if the trade [was] profitable," and by making them in writing it avoided a "'swearing contest[]'" about the nature of its instructions to Credit Suisse. Id. at 645-46. Furthermore, ST followed up with later, more specific objections. Although Credit Suisse argues that the later

outcome of the process.

22

objections were useless because "by then the ARS markets were in distress and it was not possible to liquidate the securities in question," the notice-of-objection clause in the agreement required only that ST make a written objection within a set time, not that Credit Suisse be able to reverse the objectionable trade.

We emphasize again that in identifying these potential distinctions, we do not imply that we would find them persuasive if we were required to decide the merits of this case ourselves or to decide how Modern Settings is best applied to the somewhat different facts of this case. We are not required to address these issues, because it is not our role here to decide whether the arbitrators correctly analyzed and applied that precedent. We hold only that such distinctions are sufficiently colorable that we can easily conclude that the arbitrators, whether right or wrong, did not manifestly disregard Modern Settings.

The other line of cases that Credit Suisse says the arbitrators manifestly disregarded involves the reasonable-reliance element of a fraud claim. To make out a fraud claim, a plaintiff must show that it reasonably relied on the misrepresentations of the defendant. See SEC v. DiBella, 587 F.3d 553, 563 (2d Cir. 2009) (requiring reasonable reliance under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)); Crigger, 443 F.3d at 234 (requiring it under New York state law). That much is "well defined, explicit, and clearly applicable." Merrill Lynch, 808 F.2d at 934. But the word "reasonable" (or sometimes "justifiable") is inherently imprecise, and our decisions establish only the general rule to be applied, not its specific application to the particular facts of this case. Indeed, our evaluation of the reasonable-reliance element has involved

23

many factors to "consider[] and balance[]," no single one of which is "dispositive." Brown v. E.F. Hutton Grp., Inc., 991 F.2d 1020, 1032 (2d Cir. 1993). Accordingly, reasonable reliance is often a question of fact for the jury rather than a question of law for the court, as for example in Crigger, the decision Credit Suisse cites most prominently on this issue. Our Crigger decision upheld a jury verdict against the plaintiffs but did not hold that the plaintiffs failed to show reasonable reliance as a matter of law. 443 F.3d at 236. This is not the sort of legal issue that lends itself well to manifest-disregard claims.

Moreover, Credit Suisse does not contend that it cited to the arbitrator any reasonable-reliance precedent that is on all fours with this case. Rather, the cases Credit Suisse cited on reasonable reliance, like the case it cited on notices of objection, are all at least plausibly distinguishable, and the arbitrators therefore did not manifestly disregard the law by reaching a differing result. In Brown, for instance, we found no reasonable reliance as a matter of law but considered several factors that might lead to a different outcome in this case. 991 F.2d at 1032. First, we emphasized that "none of the [plaintiffs] allege[d] the existence of a fiduciary relationship," id., while in this case ST does allege such a relationship. Cf. Emergent Capital Inv. Mgmt., LLC. v. Stonepath Grp., Inc., 343 F.3d 189, 196 (2d Cir. 2003) (finding "reliance on . . . alleged extra-contractual representations" unreasonable "absent any allegation of a fiduciary relationship"). Second, Brown involved only "general" misrepresentations, 991 F.2d at 1032, while Credit Suisse specifically represented it was buying only government-backed ARS when it was not. Third, in Brown we noted the possible relevance of "concealment

24

of the fraud," id., of which there was none in that case and plenty in this one. A fourth possible distinguishing factor, though one we did not rely on heavily in Brown, is that the defendant in that case issued a prospectus that explicitly warned potential investors not to rely on representations outside that document, see 991 F.2d 1032 n.4, while this case involves no such disclaimer.

None of Credit Suisse's other cases, all of which we have carefully considered, are significantly more relevant. Its manifest-disregard claims all fail, even assuming the survival of that ground for vacating arbitral awards.

III.    **Implementation of the Award**

Having rejected Credit Suisse's attacks on the arbitration award, we now turn to some more technical points about how the district court's judgment implemented that award. The first issue involves accounting for cash ST received from the post-award sale of securities to Deutsche Bank. The judgment below requires Credit Suisse to pay ST the full amount of the award, at which point ST is to render to Credit Suisse in return both the securities remaining after the sale and the roughly $75 million in cash that it received from the sale. Rather than crediting the money ST received from the sale against Credit Suisse's remaining obligations, the judgment thus requires Credit Suisse to pay ST $75 million that ST will then hand right back. More importantly, the judgment requires Credit Suisse to continue paying interest on the full original value of the portfolio, including on the $75 million that ST already received from the sale. Credit Suisse argues that the district court should have treated the $75 million as a payment in partial satisfaction of

25

the award, thus reducing both Credit Suisse's principal obligation to ST and the interest it owes on that obligation. We review for abuse of discretion, see In re Assicurazioni Generali, S.p.A., 592 F.3d 113, 120 (2d Cir.), cert. denied, 131 S. Ct. 297 (2010), and we vacate the judgment on this point.

It makes little sense to have Credit Suisse pay ST money that ST will immediately return to Credit Suisse. Allowing Credit Suisse to pay just its *net* obligation avoids "the absurdity of making A pay B when B owes A." Studley v. Boylston Nat'l Bank of Boston, 229 U.S. 523, 528 (1913); see also Citizens Bank of Md. v. Strumpf, 516 U.S. 16, 18 (1995). Both New York and federal common law have recognized a right to setoff in circumstances similar to these. See Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 149 (2d Cir. 2002) (discussing setoff under New York law); Singer v. Olympia Brewing Co., 878 F.2d 596, 599-600 (2d Cir. 1989) (establishing rule of setoff in federal securities fraud cases). Such an arrangement also avoids the possibility – however remote it might be – that ST might not immediately return the $75 million it would owe Credit Suisse, forcing Credit Suisse to pursue enforcement efforts against ST in Switzerland. We therefore hold that Credit Suisse should pay ST its full obligation minus the money ST received from the sale.

It similarly makes little sense to require Credit Suisse to continue to pay interest on all of a debt that has been partially satisfied. Cf. Indu Craft, Inc. v. Bank of Baroda, 87 F.3d 614, 617 (2d Cir. 1996) (affirming district court's award of interest on net balance of verdict after setoff). ST cites no precedents approving of such a result but rather contests

26

Credit Suisse's characterization of the Deutsche Bank's payment as partially satisfying the debt. The district court agreed with ST and disregarded the money that ST received as only "an intervening payment . . . from a third-party," rejecting Credit Suisse's request to "receive credit" for that payment. But the source of the money is irrelevant: the result is the same whether the payment comes from directly Credit Suisse or, as here, from a third party that pays ST in exchange for property that is to become Credit Suisse's under the award. Either way, ST has already received some of the money owed by Credit Suisse, and Credit Suisse's interest obligations should be adjusted accordingly.

The language of the arbitral award provides ST its only plausible argument for not counting the Deutsche Bank payments, but this argument also ultimately fails. The award makes Credit Suisse liable for "interest at the rate of 4.64% on the par value of the portfolio from December 31, 2008 until the Award is paid in full." Emphasizing the "paid in full" provision, ST contends that Credit Suisse's interest obligations will remain the same no matter how large a partial payment Credit Suisse makes – even if it pays off all but a dollar. But the award's language could equally be read more favorably to Credit Suisse: because the award requires payment of interest on the "par value of the portfolio," it could be read to give Credit Suisse credit for $153,500,000 (the face value of the securities sold) instead of just $74,582,000 (the amount of cash received from Deutsche Bank). Crediting Credit Suisse for a payment that ST has not received, however, is just as absurd as requiring Credit Suisse to pay interest on an obligation it has already repaid. The unlikelihood of either reading suggests that the award simply did not contemplate a

27

scenario like the Deutsche Bank sale, which arose long after the award was issued. We therefore conclude that the district court's judgment should account for the approximately $75 million Deutsche Bank payment when calculating both Credit Suisse's principal and interest liability.

Credit Suisse argues less successfully for another modification to the judgment. Credit Suisse argues that ST receives a "double recovery of interest," first from the portfolio of securities, which ST owns until the award is paid, and second from Credit Suisse, which owes ST interest on the award and now on the judgment. To avoid this alleged double recovery, Credit Suisse argues that it should receive the interest from the portfolio instead of ST.

The award provides a specific interest schedule, however, that precludes this argument. The award credited Credit Suisse with the interest on the securities from the portfolio until December 31, 2008, offsetting Credit Suisse's other obligations by over $25 million. After December 31, 2008, however, the award provides only "interest at the rate of 4.64%" and gives Credit Suisse no setoff. The district court properly calculated interest in accordance with this plan: from the time of the underlying events to December 31, 2008, Credit Suisse owes interest as calculated by the award and set off by the amount paid on the portfolio; from December 31, 2008, to March 31, 2010, the time of the first judgment, Credit Suisse owes interest calculated at 4.64%, without setoff; and from March 31, 2010, until the time of payment, Credit Suisse owes interest at the federal post-judgment rate, see 28 U.S.C. § 1961(a), also without setoff.

28

Credit Suisse asserts, in line with the argument we adopted regarding the Deutsche Bank proceeds, that the award is "silent as to post-award interest received on the securities" and that we may therefore give Credit Suisse that interest. But unlike the proceeds from the Deutsche Bank sale – a situation the award seems not to have contemplated – the award does give *pre*-award interest from the securities to Credit Suisse, so that its "silence" on the subject of *post*-award interest strongly suggests by negative implication that the arbitrators contemplated and rejected a similar treatment of the interest received after the award was rendered. And, although such a different treatment of interest before and after December 2008 may be odd, it is no more odd than the difference in interest on ST's damages before and after March 31, 2010, the time of the judgment, when the lower federal post-judgment rate replaces the much higher award rate of 4.64%. The arbitrators may have applied an effectively higher rate after the award to motivate Credit Suisse to pay more quickly, or to compensate ST for the low interest rates in effect at the time, or as a compromise between such lower rates and the higher 9% New York statutory rate that ST requested, see C.P.L.R. 5004, or based on some combination of these or other factors. Whatever the arbitrators' reasoning, Credit Suisse gives us no persuasive ground to reject it and we therefore affirm the district court on this point.

## CONCLUSION

To summarize: We reject Credit Suisse's attacks on the arbitral award, and affirm the judgment of the district court insofar as it confirms the award and denies Credit

29

Suisse's motion to vacate it. We similarly affirm the district court's judgment implementing the award in all respects, except to the extent that the district court should have credited against the amount of the award the funds received by ST from the sale of certain securities to Deutsche Bank, and correspondingly reduced the amount of interest due. To that extent, we vacate the judgment and remand to the district court to recalculate the amount of the judgment in this regard.

Accordingly, the judgment of the district court is AFFIRMED in part and VACATED in part, and REMANDED for further proceedings consistent with this opinion.